Carl A. Tibbetts, Trial Counsel (CT 3248)
(tibbettsc@sec.gov)
Mark A. Adler, Local Counsel (MA 8703)
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-4030
Telephone: (202) 551-4483
Facsimile: (202) 772-9245

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



**UNITED STATES SECURITIES AND**
**EXCHANGE COMMISSION,**

        **Plaintiff,**

    **vs.**

**JOHN F. MARSHALL, Ph. D.**
**ALAN L. TUCKER, Ph. D., AND**
**MARK R. LARSON**

        **Defendants.**

08 CV 2527

-- CV --

**Complaint**

Plaintiff United States Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF THE ACTION

1.     This is an insider trading case involving illegal trading and tipping by defendants John F. Marshall, Ph. D., Alan L. Tucker, Ph. D., and Mark R. Larson in advance of Eurex Frankfurt AG's ("Eurex") $2.8 billion cash merger agreement with International Securities Exchange Holdings, Inc. ("ISE"). The defendants were all business partners at Marshall Tucker and Associates, LLC ("Marshall-Tucker"), a New York based financial consulting partnership.

2.     John F. Marshall was a company insider at ISE. From at least November 2006 through April 2007, through his positions as Vice Chairman of ISE's board, Chairman of its Audit and Finance Committee, and member of its Executive Committee,

Marshall received detailed, current information regarding the highly confidential ISE-Eurex merger talks.

3.    On several occasions throughout this period, Marshall, in breach of his fiduciary duties to ISE and its shareholders as ISE's Vice Chairman, tipped his two outside business partners, Tucker and Larson, by providing them with material, nonpublic, highly confidential information concerning the existence of, and key developments in, the ISE-Eurex merger talks.

4.    Tucker and Larson used the material, nonpublic information Marshall provided them, by trading in ISE securities in their own personal brokerage accounts. Tucker invested more than $1 million in ISE securities during the course of the scheme, buying 20,000 shares of ISE common stock and a total of over nine hundred ISE call option contracts, all of whose strike prices were above, and most considerably above, the contemporaneous trading prices of ISE's common stock.

5.    Larson wired $500,000 in Marshall-Tucker partnership funds to Tucker's brokerage account to fund approximately 50% of Tucker's $1 million ISE investment. Tucker funded the remainder of his ISE investment through substantial and unprecedented margin loans in his brokerage account.

6.    During this same time period, Larson bought $81,000 worth – 1,700 shares – of ISE common stock in less than two months, almost doubling an ISE common stock position that had taken him one year to accumulate, and that had lain dormant in his account for nearly a year. Larson took out margin loans to pay for these additional ISE purchases, which took place as Tucker was also buying ISE.

7.    In at least five separate emails during the relevant period, Tucker used veiled language to communicate with Marshall, and sometimes Larson, about the unlawful trading. In these communications, Tucker described the performance of certain ISE securities purchased in his account, and discussed new plans to augment, or "leverage," this unlawful trading.

8.    Tucker purchased more than seven hundred of the ISE call option contracts that he bought during the scheme in the final four days of trading before the public announcement. The strike prices of these options were substantially out-of-the-money, in amounts ranging from $6 to $14 per contract above ISE's contemporaneous common stock prices. In addition, more than half of his purchases comprised a full 100% of the volume in the respective option series on the dates Tucker traded.

9.    ISE's stock price nearly doubled upon the April 30, 2007 announcement that Eurex and ISE had signed a definitive merger agreement. In addition, the trading prices of Tucker's out-of-the-money call options increased even more dramatically, reaching levels at least 22 times — and as much as 81 times — higher than the prices at which he had purchased them.

10.    By the close of trading on the announcement date, Tucker's call options had increased in value by approximately $729,000; while his 20,000 shares of ISE common stock had increased in value by approximately $375,000. Thus, Tucker's ISE trading resulted in illegal profits totaling approximately $1.104 million.

11.    For their part, the 1,700 ISE shares that Larson purchased increased in value by approximately $31,000 on the announcement date.

12.    In their ISE trading, Tucker and Larson used the material nonpublic information that Marshall had tipped to them. At the time of all this trading and tipping, Marshall knew or recklessly disregarded, and Tucker and Larson knew or should have known that, Marshall's tipping of Tucker and Larson was in breach of Marshall's fiduciary duty to ISE as ISE's Vice Chairman. By their conduct, each of the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j (b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and they will continue to do so unless restrained or enjoined by this Court.

13.    The SEC seeks permanent injunctions enjoining defendants from further violations of the federal securities laws, disgorgement of their unlawful trading profits

with prejudgment interest, civil monetary penalties, an officer and director bar against Marshall, and any additional relief that the Court deems appropriate.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d) and 78u(e), 78u-1, and 78aa].

15.     Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

16.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial portion of the conduct alleged in this complaint occurred within the bounds of the Southern District of New York. Marshall participated in meetings discussing the ISE-Eurex talks in the Southern District; ISE and Eurex personnel engaged in merger discussions and related meetings in the Southern District; ISE's common stock was listed for trading on an exchange located in the Southern District; and Tucker placed some of his illegal trades from his Pace University telephone number, located in the Southern District.

## DEFENDANTS

17.     **Defendant Marshall,** age 55, resides in Stony Brook, New York. During the relevant period, Marshall served as the Vice Chairman of ISE's Board, a member of its Executive Committee, and Chairman of its Audit and Finance Committee. Marshall also served as the Senior Principal of Marshall-Tucker, an outside consulting partnership (unaffiliated with ISE) based in Port Jefferson, New York. At all relevant times, defendants Tucker and Larson were Marshall's partners at Marshall-Tucker.

18.     **Defendant Tucker,** age 46, resides in Yardley, Pennsylvania. Throughout the relevant period Tucker was a partner at Marshall-Tucker along with defendants Marshall and Larson. Tucker also served as a professor at Pace University's

Lubin School of Business in New York City, and as an adjunct professor at New York University's Stern School of Business, teaching courses in finance and securities transactions.

19.    **Defendant Larson,** age 44, resides in Miller Place, New York, and throughout the relevant period was a partner of defendants Marshall and Tucker at Marshall-Tucker.

## OTHER ENTITIES

20.    ISE was at all relevant times a Delaware corporation headquartered in New York, New York. Prior to its acquisition by Eurex, ISE was registered with the Commission pursuant to Section 19(a) of the Exchange Act and its stock was listed on the New York Stock Exchange.

21.    Eurex is a company organized under the laws of the Federal Republic of Germany. Begun in 1998, Eurex is today the world's largest derivatives market. ISE operated – and now Eurex, through an independent wholly owned subsidiary operates – International Securities Exchange, LLC, an options exchange registered with the SEC.

22.    Marshall-Tucker is a New York financial consulting partnership headquartered in Port Jefferson, New York. At all relevant times, defendants were the three partners in the firm. On March 23, 2007, Marshall's daughter became a minority partner in the firm. Marshall and Larson had separate office space at Marshall-Tucker's Port Jefferson office, while Tucker performed his Marshall-Tucker work from his home in Yardley, Pennsylvania.

## FACTS

### The Marshall-Tucker Partnership and its ISE Holdings

23.    Marshall-Tucker has operated since at least 1991, as a financial consulting partnership providing, among other services, training programs in numerous areas of finance to a variety of clients, primarily personnel of investment banks. Prior to March 23, 2007, Marshall and Tucker each held 35.72% of Marshall-Tucker's voting and equity

interests, while Larson held the remaining 28.56%, and the defendants were the only members of the partnership's Executive Committee.

24.    On March 23, 2007, Marshall's daughter became a Marshall-Tucker partner with a 7.5% share of the voting and equity interests. Marshall, Tucker, and Larson each reduced their voting and equity interests in equal amounts to accommodate Marshall's daughter's addition.

25.    Marshall-Tucker maintained trading accounts with brokerage firms to invest a portion of its capital in securities. Tucker oversaw this investment activity. Marshall-Tucker's partnership agreement required Tucker to consult with the Executive Committee about Marshall-Tucker's investment guidelines, defined as "the types of strategies that may be employed, the sizes of the positions taken, and the level of risk accepted."

26.    The agreement further required that Marshall-Tucker's investment guidelines be approved by a two-thirds (2/3) vote of the voting interests on the Executive Committee. Prior to March 23, 2007, Marshall and Tucker each separately held more than one-third of Marshall-Tucker's voting interests, and therefore, held separate veto power over Marshall-Tucker's investment guidelines.

27.    The agreement further stated that Marshall held full executive decision-making authority at Marshall-Tucker. The agreement stated that Larson was responsible for overseeing Marshall-Tucker's day-to-day operations, including the maintenance of its financial records and banking relationships and the timely satisfaction of Marshall-Tucker's financial obligations.

28.    In approximately April 2005, Marshall-Tucker created a Rule 10b5-1 plan, administered by an outside investment company, to invest the firm's capital in ISE and other securities. Because of Marshall's position as an ISE insider, Marshall-Tucker was required to pre-clear with ISE's legal department any trades it made in ISE securities, whether pursuant to the Rule 10b5-1 plan or otherwise. By October 2006, Marshall-

6

Tucker had purchased 24,300 shares of ISE common stock through its Rule 10b5-1 plan. Marshall-Tucker's Rule 10b5-1 plan did not allow for the purchase of bullish ISE call options.

### The First Unlawful Trade: Tucker Purchases ISE February $50 Call Options

#### Marshall's Learns of Talks and Tips Tucker

29.     On or about November 20, 2006, Marshall learned of the ISE-Eurex talks, which had begun in early October 2006. On or about November 20th, ISE selected the codename "Project Elena" to refer to the ISE-Eurex talks. Between November 20, 2006 and December 5, 2006, Marshall either participated in, or was briefed on, three nonpublic ISE Executive Committee meetings that discussed the ISE-Eurex talks. At the conclusion of these meetings, Marshall knew that: (i) the parties had agreed that any transaction would be in the form of a cash offer by Eurex; (ii) ISE had informed Eurex that it expected both "take-over" and "going private" premiums; and (iii) both companies had agreed to move aggressively towards completing a deal by the end of January 2007.

30.     On December 14, 2006, ISE held another nonpublic Executive Committee meeting that ended at 5:35 p.m. At this meeting, ISE's Chief Executive Officer (CEO) provided an update on the ISE-Eurex talks, and reported that the timetable for a Eurex deal had extended from the end of January 2007 to the middle of February 2007. ISE's CEO also reported that (i) Eurex and ISE counsel planned to meet initially with SEC staff to discuss any regulatory hurdles associated with a transaction; and (ii) ISE's bankers were providing Eurex with financial models to assist Eurex's valuation of ISE.

31.     Marshall did not attend the December 14, 2006 meeting, but ISE's CEO briefed him on the meeting approximately two hours after it ended. After Marshall attempted to reach ISE's CEO in earlier calls to both his cell phone and office line, ISE's CEO placed a seven-minute call beginning at 7:40 p.m. from his cellular phone to Marshall's cellular phone and informed him of the ISE-Eurex developments.

32.     Immediately after this call ended, Marshall placed a twenty-minute call beginning at 7:47 p.m. from his cellular phone to Tucker's cellular phone. During this conversation, Marshall tipped Tucker by providing him with nonpublic, material information concerning the ISE-Eurex talks.

33.     The next day, December 15th, Marshall, Tucker, and Larson started to discuss trading in ISE. On December 15th, Marshall, Tucker, and Larson had a 1 p.m. conference call with Marshall-Tucker clients regarding Marshall-Tucker business. Tucker emailed Larson before the meeting began and wrote, "[a]t the end of today's conference call, let's . . .discuss . . . ISE."

34.     While the Marshall-Tucker conference call was underway, ISE's in-house counsel emailed ISE's officers, directors, and senior executives, including Marshall. ISE's in-house counsel informed them that a blackout period would be imposed on ISE trading beginning on Monday December 18, 2006 and ending twenty-four hours after fourth-quarter earnings were released, which was expected to be at the end of January 2007. The email also stated that no one could enter into a Rule 10b5-1 plan during the blackout period. That same day, Marshall forwarded the internal ISE email to Tucker and Larson.

### Tucker Purchases ISE Call Options Using Funds Wired from Marshall-Tucker

35.     Armed with material, nonpublic information provided by Marshall about the ISE-Eurex merger talks, the defendants acted in concert by using Marshall-Tucker partnership funds to pay for ISE purchases in Tucker's personal brokerage account.

36.     On Tuesday December 26, 2006, Tucker placed a call from his home telephone to his brokerage firm to request instructions for wiring funds into his sole personal brokerage account. Tucker made all the investment decisions for this account, and from at the least the middle of 2002, Tucker had never wired any funds into the account.

37.     Tucker communicated with Marshall, Larson, or both immediately following his call to his brokerage firm. First, Tucker placed a call from his home

telephone to Marshall-Tucker's toll-free number and spoke to either Larson, Marshall, or both. Second, immediately after this call ended, Tucker placed a call from his cellular phone to Larson's cellular phone and spoke to Larson.

38.    Later that same day, just approximately two hours after Tucker had spoken to Larson, Larson wired $40,000 from a Marshall-Tucker savings account into Tucker's personal brokerage account. Larson set up and authorized this wire. Marshall and Larson were the only two signatories on this Marshall-Tucker savings account.

39.    The next day, December 27, 2006, Tucker purchased 100 ISE February $50 call option contracts at $2.00 per contract. These options were set to expire in the middle of February, which was consistent with the material, nonpublic information possessed by Marshall at the time: that the ISE-Eurex merger would be completed in mid-February.

40.    On the 28th and 29th of December, Tucker purchased an additional 100 ISE February $50 call option contracts at approximately $2.00 per contract. In total, Tucker purchased a total of 200 ISE February $50 call option contracts and invested approximately $40,000, using virtually all of the Marshall-Tucker funds that Larson had wired into Tucker's brokerage account.

41.    At the time of these purchases, ISE's stock was trading at approximately $46 per share, and therefore, the options Tucker purchased were out-of-the-money by approximately $4-per-share.

42.    In total, Tucker's 200-contract option purchase accounted for over 79% of the trading volume in the February $50 calls on his purchasing days. Since at least the middle of 2002, this transaction was the first ISE purchase, the first options purchase, and the first securities purchase in Tucker's sole brokerage account.

43.    Despite the fact that Marshall-Tucker partnership monies were used to fund Tucker's ISE February $50 call options position, Marshall-Tucker did not obtain pre-clearance from ISE to allow for these trades.

**Tucker Updates Marshall and Larson on the Performance of the February
$50 Call Options**

44.    Prior to the expiration of the February $50 call options position held in his
account, Tucker, in at least three separate email communications, updated his defendant
partners on the performance of that call options position.

45.    All three of these emails were sent to Marshall, with two of them copied to
Larson. The two emails on which Larson was copied included the update as one among
many other items of pending Marshall-Tucker business.

46.    Tucker sent the first email on Sunday January 21, 2007. On that date,
Tucker sent an email to Marshall, copying Larson, with "Updates" as the email's subject
line. The email contained fourteen separate items, all dealing with Marshall-Tucker
business. In the 11th item, Tucker wrote, "Program is not doing well with S at 45ish."

47.    The "program" referred to the Marshall-Tucker funded February $50 ISE
call option position in Tucker's brokerage account. ISE's stock had closed at $45.52 on the
last trading day prior to the email, and thus, its stock price, or "S" (as described by Tucker)
was trading at "45ish."

48.    Given the options' $50 strike price and looming mid-February expiration
date, the defendants' "program" was "not doing well."

49.    By February 1st, ISE's stock price had fallen to approximately $43 per
share, and the ISE February $50 calls purchased in Tucker's account traded between 10 and
15 cents per contract, well below the $2.00 per contract that had been paid for them.

50.    On February 1st, Tucker sent a second "program" email to Marshall,
copying Larson, again with "Updates" as the email's subject line. In the last item of the
email, Tucker wrote, "Program a bust, b-d of 10-15 cents."

51.    On February 7, 2007, Marshall participated in an ISE Executive Committee
meeting. At this meeting, Marshall learned that the timetable for an ISE-Eurex deal had
moved from mid-February to at least early March.

52. On Monday February 12, 2007, upon returning from his overseas vacation, Tucker sent a third "program" email, to Marshall. In this email, Tucker wrote, in pertinent part, "Program ends Friday."

53. On Friday February 16, 2007, the defendants' "program" failed, with ISE's stock price closing at approximately $47 per share, three dollars short of the $50 strike price. Thus, the Marshall-Tucker funded options position in Tucker's account expired worthless. The defendants were undeterred, and embarked on a new "program," with Marshall supplying updated information about the ISE-Eurex talks. Unlike the previous "program," the new one turned out to be extremely profitable.

### After the First Failed "Program," the Defendants Launch Another One

#### Tucker Sends a New "Program" Email

54. After the February $50 call options expired worthless, Tucker wasted little time in communicating about a new "program." In the new "program," Larson wired, from the same Marshall-Tucker savings account and again to Tucker's brokerage account, more than ten times the amount used for the prior "program" for the next round of purchases. In addition, Larson purchased ISE securities in his own personal brokerage account.

55. On Saturday February 17, 2007, the very day after the first "program" ended, Tucker wrote yet another "Updates" email, to Marshall. In the 9th item, Tucker wrote, "Program over. I will think about a new one."

#### Marshall Learns of Eurex's First Price-Per-Share Offer and Tips Tucker and Larson

56. Prior to February 22, 2007, ISE's CEO informed Eurex that ISE would not start intensifying its efforts with the SEC for regulatory approval until it determined that Eurex's proposed valuation of ISE fell within an acceptable range.

57. On February 22, 2007, Eurex made its first price-per-share offer for ISE, an offer of $59-per-share. This was a significant offer, as it represented an almost $12 premium over ISE's then-current stock price.

58.    ISE's CEO informed Eurex that the new $59-per-share offer needed some work, but was sufficient to intensify the dialogue with the SEC regarding regulatory approval for a possible merger transaction.

59.    On February 26 and 27, 2007, Marshall attended two days of nonpublic ISE Board meetings in New York, New York. At these meetings, ISE's outside counsel provided an overview to the Board, including Marshall, of its fiduciary duties in a merger and acquisition environment. Moreover, ISE's investment bankers provided an overview to the Board, including Marshall, of Eurex and the other potential candidates for a business combination.

60.    At meetings on February 27, 2007, ISE's CEO informed the Board, including Marshall, of Eurex's $59-per-share offer. ISE's CEO told the Board the same thing he had told Eurex: the offer needed improvement, but was sufficient for ISE to intensify its efforts with the SEC for regulatory approval.

61.    On February 27, 2007, ISE's stock price closed at $44.79. Thus, at this time, Marshall possessed critical and highly confidential information about the talks. He knew that Eurex had made an offer that represented an almost $15 premium over ISE's then-current stock price. He also knew that this offer represented a floor, and would likely be improved upon in the coming weeks and months.

62.    Armed with this information, Marshall again tipped Tucker and Larson about the latest developments. On the evening of February 27th, after these meetings had concluded, Marshall placed a two-minute call from his cellular phone to Tucker's cellular phone. Immediately after that call ended, Marshall placed a three-minute call from his cellular phone to Larson's home phone. That same evening, while in New York, New York, Tucker placed short telephone calls beginning at 8:47 p.m. and 10:18 p.m. from his cellular phone to Marshall's cellular phone. Based on historical calling patterns, it was unusual for Tucker and Marshall to speak so late in the evening.

### Defendants Larson and Tucker Immediately Purchase ISE Stock in Their Personal Brokerage Accounts

63.     On the morning of February 28, 2007, defendant Larson asked ISE's in-house counsel whether Marshall-Tucker could purchase ISE common stock pursuant to its Rule 10b5-1 plan.  When ISE's in-house counsel informed Larson that Marshall-Tucker could not, Larson asked whether he could purchase ISE common stock in his personal brokerage account.  ISE's in-house counsel answered yes, but only if, as Larson reported at a subsequent Marshall-Tucker partnership meeting, he was not privy to any privileged information about ISE.

64.     During the morning of March 1, 2007, Larson, Marshall, or both, repeatedly tried to reach Tucker, placing approximately seven separate phone calls to him in an approximately four-hour stretch.  Based on historical calling patterns between the defendants, it was highly unusual for this many calls to be placed to one of them in such a short period of time.

65.     Finally, Tucker placed a call from his cellular phone beginning at 12:40 p.m. to Marshall-Tucker's main office line, and spoke with Larson, Marshall, or both.

66.     Just twenty-three minutes after this call ended, Tucker placed a call from his home telephone to his brokerage firm.  In that call, Tucker purchased 5,000 shares of ISE common stock, at a cost of approximately $225,000.  This was Tucker's first common stock purchase in his brokerage account since at least the middle of 2002.  In fact, the only other purchase in Tucker's account during that entire time was the February $50 call options purchased as part of the defendants' "program" in December 2006.

67.     Immediately after Tucker's call to his brokerage firm ended, Tucker placed a two-minute call from his home telephone to Marshall-Tucker's toll-free number, and spoke to Larson, Marshall, or both.

68.     Just two minutes after this call ended, Larson wired $460,000 into Tucker's brokerage account. Again, Larson set up and authorized the wire, and the money came from the same Marshall-Tucker savings account used to fund the first "program."

69.     These funds were not monies that were owed to Tucker in the form of Marshall-Tucker partnership compensation or otherwise. For the period November 2006 through December 2007, Marshall-Tucker paid Tucker an average of $23,000 per month, nowhere near the $460,000 that Larson wired into his brokerage account. Moreover, during that same period, Marshall-Tucker never wrote a single check to Tucker larger than $38,000, an amount almost thirteen times less than the $460,000 that Larson wired into his brokerage account. Moreover, during that same time, all payments to Tucker were directly deposited into his checking account, with none being made into his brokerage account.

70.     At 1:32 p.m., just fourteen minutes after setting up and authorizing the $460,000 wire, Larson made an online purchase of 200 shares of ISE common stock in his personal brokerage account. This purchase cost approximately $9,000 and was funded by his brokerage account margin loan. This purchase was Larson's first activity in his personal brokerage account in nearly a year.

71.     Larson held a 2,000-share ISE position at the time of this purchase, a position that he had begun accumulating in March 2005 and had finished accumulating approximately one year later.

72.     On March 2nd, having spent just $225,000 of the $460,000 in Marshall-Tucker funds that Larson wired into his brokerage account the day before (March 1st), Tucker purchased more ISE common stock. Before making his purchase, Tucker placed a twenty-five minute call from his home telephone to Marshall-Tucker's toll-free number, and spoke to Larson, Marshall, or both.

73.     Soon after this call ended, Tucker placed a call from his home telephone to his brokerage firm. On this call, Tucker purchased an additional 5,000 shares of ISE common stock.

74.     Just nine minutes after making his 5,000 share purchase, Tucker placed an eight-minute call from his home telephone to Marshall-Tucker's toll-free number, and spoke to Marshall, Larson, or both.

75.     In total, on March 1st and March 2nd, Tucker purchased 10,000 ISE shares at a cost of approximately $455,000, almost the exact amount of Marshall-Tucker funds that Larson wired into Tucker's personal brokerage account.  After these purchases, Tucker's ISE common stock position represented almost 80% of his overall brokerage portfolio and was, by far, the single largest position he had amassed in any single security since at least the middle of 2002.

76.     Despite the fact that Marshall-Tucker partnership monies were used to fund Tucker's 10,000 share purchase, Marshall-Tucker did not obtain pre-clearance from ISE to allow for these trades.

77.     On March 5, 2007, Larson made an additional online purchase of 300 shares of ISE common stock in his personal brokerage account.  This purchase cost approximately $13,000 and was funded by Larson's brokerage account margin loan.

### Marshall Learns of Increased Offer by Eurex and Larson Purchases More ISE Common Stock

78.     On March 28, 2007, at an ISE Executive Committee meeting, Marshall learned that Eurex had increased its price-per-share offer from $59 to $66, a $7 increase.  This offer represented a premium of nearly $20 above ISE's then-current stock price.  ISE's CEO informed the Board, including Marshall, that he viewed this offer as a significant improvement, and would continue to work with Eurex to finalize regulatory approvals at the SEC.

79.     Two days later, on March 30, 2007, Larson added to his ISE position, making an additional online purchase of 500 shares of ISE common stock.  This purchase cost approximately $24,000 and was funded again by his brokerage account margin loan.

80.     Thus, in March 2007 alone, Larson had increased his existing ISE position by 1,000 shares, or 50%, and had taken out nearly $50,000 on margin to do so.

**In April 2007, as the Deal Moves Towards Completion, Defendants "Leverage" the "Program"**

Tucker Sends Yet Another "Program" Email and Both He and Larson Buy More ISE

81.     As the talks between Eurex and ISE neared completion in April 2007, the defendants decided to "leverage" the "program." On April 11, 2007, Tucker wrote yet another "Updates" email, sent from his Pace University email address, this time to Marshall, and copied to Larson. In the sixth item of the email, Tucker wrote, "Will look into leveraging the program."

82.     On April 12, 2007, the day after sending his latest "program" email, Tucker placed a call from his cellular telephone to his brokerage firm. During this call, Tucker asked whether his account was a margin account. When informed that it was, Tucker told the brokerage firm representative that he had a very large position in ISE, wanted to buy more, and wanted to do so on margin. Tucker asked the representative to determine whether that was possible and to inform Tucker about his margin limits.

83.     The representative informed Tucker that he had approximately $6,000 in actual funds and therefore had "available funds for trading" of approximately $428,000. When informed of this, Tucker asked, "ok, so $428,000 is my limit?"

84.     The representative explained that the $428,000 was technically not his limit, and informed Tucker that he also had "buying power," and therefore, the absolute most he could purchase was double his "available funds for trading," or approximately $856,000. The representative further informed Tucker, however, that he would be borrowing against the stock he owned if his investment surpassed his "available funds for trading." ($428,000).

85.    Undeterred and unconcerned by the prospect of substantially leveraging his personal brokerage account through large margin loans, Tucker placed orders to double his ISE common stock position (10,000 shares) at a cost of more than $500,000, thereby leveraging his position into the "buying power" limits of his margin account. The orders filled on April 12, 2007 and April 19, 2007.

86.    This was, since at the least the middle of 2002, the first margin purchase, of any kind, in Tucker's account. After these purchases, Tucker's total ISE position (20,000 shares) represented almost 99% of his total portfolio and Tucker had, in total, invested more than $1 million in ISE securities, approximately 50% of which was funded by Marshall-Tucker partnership monies.

87.    Immediately after his orders were placed, Tucker placed a three-minute call from his cellular phone to Marshall-Tucker's main office line and spoke to Larson, Marshall, or both.

88.    Meanwhile, the same day as Tucker's April 11, 2007 "program" email, Larson made an online purchase of 500 more shares of ISE common stock. This purchase cost approximately $25,000 and was funded again by his brokerage account margin loan.

### Marshall Attends Two Days of Key Meetings and Larson Then Buys More ISE Stock

89.    On Friday April 13, 2007 and Saturday April 14, 2007, Marshall attended two days of strategic board planning meetings in Tarrytown, New York. At these meetings, ISE's Board determined that ISE's interests would be best served by finalizing a strategic transaction to enable it to become part of a truly global exchange, and that ISE, because of its size, would likely not be the acquiring party in any transaction.

90.    On Saturday April 14, 2007, while the meetings were still ongoing, Marshall placed a call from his cellular phone to Tucker's home telephone and spoke to Tucker.

91.     On April 19, 2007, Larson made an online purchase of 200 more shares of ISE common stock. This purchase cost approximately $10,000 and was funded again by his brokerage account margin loan. Thus, in approximately a month-and-a-half, Larson had increased his existing ISE position by 85% and had spent approximately $81,000 on margin to do so.

### Marshall Participates in Final Stages of Talks and Tucker Buys Heavily in ISE Out-of-the-Money Call Options

92.     On April 20, 2007, Eurex and ISE achieved a major breakthrough in the talks, by reaching a sufficient regulatory framework that would permit an acquisition of ISE by Eurex. That same day, Eurex's counsel submitted a draft merger agreement to ISE, with the expectation that a final merger agreement could be presented to ISE's Board and Executive Committees at a scheduled April 30, 2007 meeting. The next day, April 21st, Eurex began due diligence on ISE.

93.     Marshall was fully aware of these developments. During the period April 20th through April 23rd, Marshall engaged in email communications with an ISE colleague about the transaction; and also, on April 23rd, Marshall placed a twenty-seven minute call from his cellular phone to ISE's CEO's office line.

94.     During this period, Marshall and Tucker spoke on several occasions and Marshall tipped Tucker with information about the latest developments. First, on Saturday, April 21st, Tucker placed a call from his cellular phone to Marshall's cellular phone and spoke to Marshall; on Monday April 23rd, Tucker placed a call from his home telephone to Marshall-Tucker's toll-free number and spoke to Marshall, Larson, or both; and then, on Tuesday April 24th, Marshall, Larson, or both, placed a call beginning at 9:27 a.m. from Marshall-Tucker's second office line to Tucker's home telephone.

95.     Beginning on April 24, 2007, just forty-minutes after his 9:27 a.m. call with Marshall, Larson, or both ended, and culminating on April 27, 2007, Tucker bought hundreds out-of-the-money ISE call options in his brokerage account. In all, Tucker

purchased 729 contracts, further pushing into the "buying power" portion of his margin account by more than $16,000. Tucker placed at least two of the options orders from his Pace University telephone number.

96.    Other than the Marshall-Tucker funded options he purchased as part of the first "program," this was the first options purchase of any kind in Tucker's sole brokerage account since at least the middle of 2002.

97.    Not only were all of these options significantly out-of-the-money at the time they were purchased, but they also had imminent expiration dates. 400 of the options purchased by Tucker had a strike price of $55 and the other 329 had a strike price of $60. At the time of these purchases, ISE's common stock traded between $45.72 and $48.95. Therefore, these options were substantially out-of-the-money, at prices ranging from $6.05 and $14.28 per contract.

98.    Most of the options were set to expire in the very near term, with 300 of the $55 calls having an expiration date of May 18, 2007, less than thirty-days away, and 100 of the $55 calls and 300 of the $60 calls having an expiration date of June 16, 2007, less than two months away. The remaining 29 calls were set to expire on July 20, 2007, less than three months away.

99.    With respect to three of the four separate options series he purchased, Tucker was the only buyer in the entire market. Specifically, in the case of three of the options series he purchased, Tucker's purchases comprised fully **100%** of their overall volume on the date of his purchase.

### Defendants' Illegal Profits

100.    On April 30, 2007, Eurex publicly announced its $67.50-per-share cash offer for ISE, and by the market close, ISE's stock price had increased 20 points, for an almost 47 percent gain.

101.    The out-of-the-money ISE call options purchased by Tucker increased in an exponential fashion, increasing to trading prices between 22 and 81 times the prices at which Tucker bought them.

102.    Tucker's 729 call option contracts increased in value by approximately $729,000 on the announcement date. Also, Tucker's 20,000 ISE shares increased in value by approximately $375,000 on the announcement date. Thus, Tucker's total ISE trading resulted in illegal profits of approximately $1.104 million.

103.    For their part, the 1,700 ISE shares that Larson purchased increased in value by approximately $31,000 on the announcement date.

**Tucker's Statements to the Staff Evidence a Consciousness of Wrongdoing**

104.    In a telephone interview with members of the SEC staff, Tucker claimed that he funded all the ISE purchases in his account himself and that no Marshall-Tucker funds were used to fund them. Tucker failed to tell the staff about the wires his brokerage account received from Marshall-Tucker in an apparent effort to hide this important connection between his ISE purchases and his business with Marshall. His efforts to hide this information from the staff demonstrate a consciousness of wrongdoing.

### CLAIM
Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5
[17 C.F.R. § 240.10b-5] promulgated thereunder

105.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 104 above.

106.    John F. Marshall misappropriated material nonpublic information about Eurex's planned cash offer for ISE and used that information to tip defendants Alan L. Tucker and Mark R. Larson in breach of his fiduciary duties to ISE and its shareholders.

107.    Defendants Alan L. Tucker and Mark R. Larson knew or should have known that the information they received from Marshall was material nonpublic information provided in breach of Marshall's fiduciary duties to ISE.

108.    As a result, between at least December 14, 2006 and April 30, 2007, each defendant, directly or indirectly, in connection with trades in ISE common stock and options, by use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; or (3) engaged in acts, practices or transactions which operated as a fraud or deceit upon purchasers or sellers of securities or upon other persons, in connection with the purchase or sale of securities.

109.    As part of the violative conduct, each defendant, while in possession of material nonpublic information about Eurex's plans to make a cash offer for ISE, and under circumstances in which they knew or should have known that the information was confidential and had been obtained through misappropriation, a breach of fiduciary duty or other relationship of trust and confidence, or other wrongful acts, purchased or caused the purchase of ISE securities.  Each defendant, while under a legal duty to either disclose or abstain from trading, did not disclose the material nonpublic information they possessed to the sellers of the ISE securities that they bought.

110.    By reason of the foregoing acts, practices, and transactions, each defendant violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Grant a Final Judgment of Permanent Injunction restraining and enjoining each defendant and their agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating

Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] promulgated thereunder.

## II.

Order Tucker and Larson to disgorge illegal trading profits plus prejudgment interest thereon, and order Marshall to jointly and severally disgorge the illegal trading profits of Tucker and Larson (plus prejudgment interest thereon).

## III.

Order the defendants to pay civil penalties of up to three times their trading profits pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

## IV.

Order that Marshall be permanently barred from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)]; and

## V.

Grant such other and further relief as this Court may deem just, equitable, and

necessary.

Dated: _____3/13/08_____

Respectfully submitted:

By: _____

Mark A. Adler (MA 8703)
Carl A. Tibbetts, Trial Counsel (CT 3248)
Cheryl J. Scarboro
C. Joshua Felker
J. Lee Buck, II
Ricky Sachar
Attorneys for Plaintiff
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-4030
Phone: (202) 551-4483 (Tibbetts)
Facsimile: (202) 772-9245, 9233
Tibbettsc@sec.gov