Carl A. Tibbetts, Trial Counsel (CT 3248)
(tibbettsc@sec.gov)
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-4030
Telephone:  (202) 551-4483
Facsimile:  (202) 772-9245

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** :<br><br>　　　　**Plaintiff,** :<br><br>　　vs. :<br><br>**JOHN F. MARSHALL, Ph. D.**<br>**ALAN L. TUCKER, Ph. D., AND**<br>**THOMAS GENZALE** :<br><br>　　　　**Defendants.** : | **C.A. No. 08CV 2527 (GBD)**<br><br>**First Amended Complaint** |

## FIRST AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") for its First Amended Complaint in this action, alleges as follows against John F. Marshall, Ph. D. ("Marshall"), Alan L. Tucker, Ph. D. ("Tucker"), and Thomas Genzale ("Genzale"):

## SUMMARY OF THE ACTION

1.　　This is an insider trading case involving illegal trading and tipping by defendants Marshall, Tucker, and Genzale in advance of Eurex Frankfurt AG's ("Eurex") $2.8 billion cash merger agreement with International Securities Exchange Holdings, Inc. ("ISE").  At all relevant times, defendants Marshall and Tucker were business partners at Marshall Tucker and Associates, LLC ("Marshall-Tucker"), a New York based financial consulting partnership.  At all relevant times, defendants Marshall and Genzale were close personal friends.

2.      Marshall was a company insider at ISE.  From at least November 2006 through April 2007, through his positions as Vice Chairman of ISE's board, Chairman of its Audit and Finance Committee, and member of its Executive Committee, Marshall received detailed, current information regarding the highly confidential ISE-Eurex merger talks.

3.      On several occasions throughout this period, Marshall, in breach of his fiduciary duties to ISE and its shareholders as ISE's Vice Chairman, tipped Tucker and Genzale, by providing them with material, nonpublic, highly confidential information concerning the existence of, and key developments in, the ISE-Eurex merger talks.

4.      In addition, Marshall, while in possession of material, nonpublic information regarding the ISE-Eurex talks, recommended the purchase of ISE to his other Marshall-Tucker business partner ("the other Marshall-Tucker partner").

5.      Tucker and Genzale used the material, nonpublic information Marshall provided them, by trading in ISE securities in their own personal brokerage accounts. Tucker invested more than $1 million in ISE securities during the course of the scheme, buying 20,000 shares of ISE common stock and a total of over nine hundred ISE call option contracts, all of whose strike prices were above, and most considerably above, the contemporaneous trading prices of ISE's common stock.

6.      Genzale invested more than $240,000 in ISE securities during the course of the scheme, buying 3,050 shares of ISE common stock and a total of over one-thousand ISE call options, all of whose strike prices were above, and most considerably above, the contemporaneous trading prices of ISE's common stock.

7.      The other Marshall-Tucker partner purchased a total of 1,700 shares of ISE common stock during the course of the ISE-Eurex merger talks.

8.      Tucker purchased more than seven hundred of the ISE call option contracts that he bought during the scheme in the final four days of trading before the public announcement.  The strike prices of these options were substantially out-of-the-

2

money, in amounts ranging from $6 to $14 per contract above ISE's contemporaneous common stock prices.  In addition, more than half of his purchases comprised a full 100% of the volume in the respective option series on the dates Tucker traded.

9.     Genzale purchased almost six hundred of the ISE call option contracts he bought during the scheme in the final few days of trading before the public announcement.  The strike prices of these options were substantially out-of-the-money, in amounts up to $7 per contract above ISE's contemporaneous common stock prices.

10.     ISE's stock price nearly doubled upon the April 30, 2007 announcement that Eurex and ISE had signed a definitive merger agreement.  In addition, the trading prices of Tucker's and Genzale's out-of-the-money call options increased even more dramatically, reaching levels at least 22 times — and as much as 81 times — higher than the prices at which they had purchased them.

11.     Tucker's ISE trading resulted in illegal trading profits exceeding $1 million; Genzale's trading resulted in illegal trading profits of approximately $826,000; and the other Marshall-Tucker business partner's ISE trading resulted in illegal trading profits of approximately $31,000.

12.     In their ISE trading, Tucker and Genzale used the material nonpublic information that Marshall had tipped to them.  At the time of all this trading and tipping, Marshall knew or recklessly disregarded, and Tucker and Genzale knew or should have known that, Marshall's tipping of Tucker and Genzale was in breach of Marshall's fiduciary duty to ISE as ISE's Vice Chairman.  By their conduct, each of the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j (b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and they will continue to do so unless restrained or enjoined by this Court.

13.     The SEC seeks permanent injunctions enjoining defendants from further violations of the federal securities laws, disgorgement of their unlawful trading profits

with prejudgment interest, civil monetary penalties, an officer and director bar against Marshall, and any additional relief that the Court deems appropriate.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d) and 78u(e), 78u-1, and 78aa].

15.     Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

16.     Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial portion of the conduct alleged in this complaint occurred within the bounds of the Southern District of New York.  Marshall participated in meetings discussing the ISE-Eurex talks in the Southern District; ISE and Eurex personnel engaged in merger discussions and related meetings in the Southern District; ISE's common stock was listed for trading on an exchange located in the Southern District; both Tucker and Genzale placed some of their trades from areas located in the Southern District.

## DEFENDANTS

17.     **Defendant Marshall,** age 55, resides in Stony Brook, New York.  During the relevant period, Marshall served as the Vice Chairman of ISE's Board, a member of its Executive Committee, and Chairman of its Audit and Finance Committee.  Marshall also served as the Senior Principal of Marshall-Tucker, an outside consulting partnership (unaffiliated with ISE) based in Port Jefferson, New York.  At all relevant times, defendants Marshall and Tucker, along with the other Marshall-Tucker partner, were partners at Marshall-Tucker.

18.     **Defendant Tucker,** age 46, resides in Yardley, Pennsylvania. Throughout the relevant period, Tucker was a partner at Marshall-Tucker along with

4

defendant Marshall and the other Marshall-Tucker partner.  Tucker also served as a professor at Pace University's Lubin School of Business in New York City, and as an adjunct professor at New York University's Stern School of Business, teaching courses in finance and securities transactions.

19.    **Defendant Genzale**, age 54, resides in Smithtown, New York. Throughout the relevant period, Genzale worked as a stationary engineer at a New York-based hospital.

## OTHER PERSONS AND ENTITIES

20.    ISE was at all relevant times a Delaware corporation headquartered in New York, New York.  Prior to its acquisition by Eurex, ISE was registered with the Commission pursuant to Section 19(a) of the Exchange Act and its stock was listed on the New York Stock Exchange.

21.    Eurex is a company organized under the laws of the Federal Republic of Germany.  Begun in 1998, Eurex is today the world's largest derivatives market.  ISE operated – and now Eurex, through an independent wholly owned subsidiary operates – International Securities Exchange, LLC, an options exchange registered with the SEC.

22.    Marshall-Tucker is a New York financial consulting partnership headquartered in Port Jefferson, New York.  At all relevant times, defendants Marshall and Tucker, along with the other Marshall-Tucker partner, were partners at the firm.

## FACTS

**Genzale Purchases ISE January $55 Call Options and ISE Common Stock**

Marshall Learns of Talks and Tips Genzale

23.    On or about November 20, 2006, Marshall learned of the ISE-Eurex talks, which had begun in early October 2006.  On or about November 20th, ISE selected the codename "Project Elena" to refer to the ISE-Eurex talks.  Marshall was briefed on the content of a nonpublic November 20th ISE Executive Committee.  In this briefing,

Marshall learned that: (i) Eurex was interested in purchasing 100% of ISE; (ii) the parties had appointed their strategic officers to identify projects to facilitate the ongoing discussions; and (iii) Eurex's target for completing a deal was early 2007.

24.    On November 22, 2006, Marshall placed a call from his home telephone to Genzale's home telephone and tipped Genzale by providing him with material, non-public information about the ISE-Eurex talks.

25.    Armed with this information, Genzale, from November 24, 2006 to November 27, 2006, purchased 120 ISE January $55 call option contracts.  These options were set to expire in the middle of January 2007, which was consistent with the material, nonpublic information possessed by Marshall at the time: that the ISE-Eurex merger would be completed in early 2007.

26.    At the time of these purchases, ISE's stock traded between $52 and $54 per share, and therefore, the options Genzale purchased were out-of-the-money by approximately $1 to $3 per share.

27.    Genzale's purchase, and all of his future ISE trades described herein, represented an unprecedented and dramatic departure from his historical trading practices.

28.    On November 27, 2006, Genzale purchased 300 shares of ISE common stock.  Then, on December 1, 2006 and December 14, 2006, Genzale purchased a total of 600 additional shares of ISE common stock.

29.    In total, Genzale invested approximately $45,000 in these 900 ISE shares, thereby making it, since at least March 2003, his largest investment in any security.

**Both Tucker and Genzale Purchase ISE February $50 Call Options**

<u>Marshall Tips Tucker, and Tucker Purchases ISE Call Options</u>

30.    Sometime in late November or early December 2006, Marshall tipped Tucker by providing him with material, non-public information about the ISE-Eurex talks.

31.    On December 14, 2006, ISE held another nonpublic Executive Committee meeting.  At this meeting, ISE's Chief Executive Officer (CEO) provided an update on the

6

ISE-Eurex talks and reported that, among other things, the timetable for a Eurex deal had extended to the middle of February 2007. Marshall did not attend the December 14, 2006 meeting, but ISE's CEO briefed him on the meeting approximately two hours after it ended.

32. From December 27, 2006 to December 29, 2006, Tucker purchased 200 ISE February $50 call option contracts. These options were set to expire on Friday February 16, 2007, which was consistent with the material, nonpublic information possessed by Marshall at the time: that the ISE-Eurex merger would be completed in mid-February.

33. Tucker's purchases cost approximately $40,000 and were funded fully by Marshall-Tucker partnership monies.

34. At the time of these purchases, ISE's stock traded at approximately $46 per share, and therefore, the options Tucker purchased were out-of-the-money by approximately $4-per-share.

### Marshall Updates Genzale on the Talks and Genzale Purchases Same Options as Tucker, and ISE Common Stock

35. Sometime between December 14, 2006 and December 26, 2006, Marshall again tipped Genzale by informing him that the timetable for an ISE-Eurex deal had changed from early 2007 to mid-February 2007. In particular, Marshall and Genzale had almost daily telephone calls beginning on December 21, 2006.

36. From December 26, 2006 to January 4, 2007, Genzale purchased 200 ISE February $50 call option contracts — the exact same options position that Tucker had just purchased.

37. On December 27, 2006 — the only day on which Genzale and Tucker both purchased the February $50 calls — their trading constituted approximately 95% of the overall customer volume in those calls.

38. On January 11, 2007 and January 19, 2007, Genzale added to his ISE common stock position by purchasing a total of 700 additional shares.

7

39.     On January 19, 2007, Genzale's investment in the ISE January $55 calls proved unprofitable, as all of these options expired worthless before any ISE-Eurex deal could be reached or announced, and without ISE's share price otherwise reaching the options' strike price while Genzale held them.

40.     On Friday, February 16, 2007, Tucker and Genzale's separate investments in the ISE February $50 calls also ultimately proved unprofitable, as all of these options expired before any ISE-Eurex deal could be reached or announced, and without ISE's share price otherwise reaching the options' strike price while Genzale and Tucker held them.

**Marshall Learns of Eurex's First Price-Per-Share Offer, Tips Genzale and Tucker, and Recommends ISE to Other Marshall-Tucker Partner**

Marshall Attends Two Days of ISE Board Meetings

41.     On February 26 and 27, 2007, Marshall attended two days of nonpublic ISE Board meetings in New York, New York.  At these meetings, ISE's outside counsel provided an overview to the Board, including Marshall, of its fiduciary duties in a merger and acquisition environment.  Moreover, the ISE Board directed ISE senior management to continue to assess the strategic landscape for any possible transactions and to continue pursuing the ongoing discussions.

42.     At meetings on February 27, 2007, ISE's CEO informed the Board, including Marshall, of Eurex's $59-per-share offer.  ISE's CEO told the Board that the offer needed improvement, but was sufficient for ISE to intensify its efforts to obtain regulatory approval.

43.     On February 26, 2007, ISE's stock price closed at $47.93.  The next day, February 27, 2007, it closed at $44.79.  Thus, at this time, Marshall possessed critical and highly confidential information about the talks.  He knew that Eurex made an offer that represented a substantial premium over ISE's then-current stock price.  He also knew that this offer represented a floor, and would likely be improved upon in the coming weeks and months.

8

<u>Marshall Tips Genzale and Tucker, and Recommends ISE to Other
Marshall-Tucker Business Partner</u>

44.     Armed with this information, Marshall again tipped Genzale and Tucker about the latest developments.  On the evening of February 27th, after the ISE Board meetings had concluded, Marshall placed a five-minute call from his cellular phone to Genzale's home telephone.  Immediately after that call ended, Marshall placed a two-minute call from his cellular phone to Tucker's cell phone.

45.     Immediately after the call to Tucker ended, Marshall placed a three-minute call from his cellular phone to his other Marshall-Tucker business partner.  On this call, Marshall informed the partner that ISE's stock price had dropped from the prior day and therefore, it may be a good time for the partnership to buy ISE.

46.     Based on this recommendation, on March 1st, the other Marshall-Tucker partner began his ISE trading by purchasing 200 shares of ISE common stock. During the remainder of the merger talks, the partner purchased an additional 1,500 shares of ISE common stock.

<u>Genzale Buys ISE Call Options and Common Stock</u>

47.     On February 28, the very next morning after Marshall tipped him, Genzale purchased 200 shares of ISE common stock.  On March 6, 2007 and March 14, 2007, Genzale purchased a total of 500 additional shares.

48.     Also, from March 1, 2007 to March 13, 2007, Genzale purchased 100 April $50 ISE call option contracts.  At the time of these purchases, ISE's stock traded between $45 and $46 per share, and therefore, the options were out-of-the-money by as much as $5 per share.

49.     Finally, on March 14, 2007, Genzale purchased 30 July $60 ISE call option contracts.

<u>Tucker Buys ISE Common Stock</u>

50.     On March 1, 2007, after being tipped by Marshall about the developments in the ISE-Eurex talks, Tucker purchased 5,000 shares of ISE common stock, at a cost of approximately $225,000.  This was Tucker's first common stock purchase in his brokerage account since at least the middle of 2002.  In fact, the only other purchase in Tucker's account during that entire time was the February $50 call options purchased in December 2006.

51.     The next day, March 2nd, Tucker purchased an additional 5,000 shares of ISE common stock.  The total 10,000 share purchase cost approximately $460,000 and was funded fully by Marshall-Tucker partnership monies.

52.     After these purchases, Tucker's ISE common stock position represented almost 80% of his overall brokerage portfolio and was, by far, the single largest position he had amassed in any single security since at least the middle of 2002.

**Marshall Learns Additional Information and Tucker Purchases More ISE Common Stock**

53.     On March 28, 2007, at an ISE Executive Committee meeting, Marshall learned that Eurex had increased its price-per-share offer from $59 to $66, a $7 increase. This offer represented a premium of nearly $20 above ISE's then-current stock price. ISE's CEO informed the Board, including Marshall, that he viewed this offer as a significant improvement, and would continue to work with Eurex to finalize regulatory approvals at the SEC.

54.     On April 12, 2007, Tucker placed orders to double his ISE common stock position (10,000 shares) at a cost of more than $500,000, thereby substantially leveraging his brokerage account through large margin loans. The orders filled on April 12, 2007 and April 19, 2007.

55.     This was, since at least the middle of 2002, the first margin purchase, of any kind, in Tucker's account.  After these purchases, Tucker's total ISE position (20,000

shares) represented almost 99% of his total portfolio and Tucker had, in total, invested more than $1 million in ISE securities, approximately 50% of which was funded by Marshall-Tucker partnership monies.

### Marshall Participates In Final Stages of Talks and Genzale and Tucker Buy Heavily In ISE Out-Of-The-Money Call Options

<u>Marshall Again Tips Genzale and Tucker</u>

56.     On April 20, 2007, Eurex and ISE achieved a major breakthrough in the talks, by reaching a sufficient regulatory framework that would permit the acquisition of ISE by Eurex.  That same day, Eurex's counsel submitted a draft merger agreement to ISE, with the expectation that a final merger agreement could be presented to ISE's Board and Executive Committee at a scheduled April 30, 2007 meeting.  Marshall was fully aware of these developments.

57.     After learning this information, Marshall spoke separately on several occasions with both Genzale and Tucker and tipped them with information about the latest developments.  With regard to Genzale, on Sunday April 22nd, Marshall placed a call from Marshall-Tucker's second office line to Genzale's home telephone.  Also, on Monday April 23rd, Marshall placed two early-morning calls from Marshall-Tucker's office lines to Genzale's home telephone.

58.     With regard to Tucker, on Saturday April 21st, Tucker placed a call from his cellular phone to Marshall's cellular phone and spoke to Marshall; on Monday April 23rd, Tucker placed a call from his home telephone to Marshall-Tucker's toll-free number and spoke to Marshall.

<u>Genzale Purchases ISE Call Options and Common Stock</u>

59.     From April 20, 2007 through April 26, 2007, Genzale purchased a total of 583 out-of-the-money ISE call options, as well as some additional ISE common stock.

60.     Not only were the options significantly out-of-the-money at the time they were purchased, but they also had imminent expiration dates.  300 of the options purchased

had a strike price of $55 and the other 283 had a strike price of $50.  At the time of these purchases, ISE's common stock traded between $47.85 and $50.42.  Therefore, these options were substantially out-of-the-money, at prices ranging up to $7 per contract.

61.    Most of the options were set to expire in the very near term, with 483 of the calls having an expiration date of May 18, 2007, less than thirty-days away, and 100 having an expiration date having an expiration date of June 16, 2007, less than two months away.

62.    On April 25, 2007 and April 26, 2007, Genzale purchased a total of 750 additional shares of ISE.  Thus, between November 20, 2006 (when Marshall learned of the merger talks) and April 26, 2007, Genzale purchased a total of 3,050 shares of ISE common stock, at a cost of approximately $150,000.

Tucker Purchases ISE Call Options

63.    Beginning on April 24, 2007 and culminating on April 27, 2007, Tucker bought hundreds out-of-the-money ISE call options in his brokerage account.  In all, Tucker purchased 729 contracts.

64.    Not only were all of these options significantly out-of-the-money at the time they were purchased, but they also had imminent expiration dates.  400 of the options purchased by Tucker had a strike price of $55 and the other 329 had a strike price of $60. At the time of these purchases, ISE's common stock traded between $45.72 and $48.95. Therefore, these options were substantially out-of-the-money, at prices ranging from $6.05 and $14.28 per contract.

65.    Most of the options were set to expire in the very near term, with 300 of the $55 calls having an expiration date of May 18, 2007, less than thirty-days away, and 100 of the $55 calls and 300 of the $60 calls having an expiration date of June 16, 2007, less than two months away.  The remaining 29 calls were set to expire on July 20, 2007, less than three months away.

66.    With respect to three of the four separate options series he purchased, Tucker was the only buyer in the entire market.  Specifically, in the case of three of the

options series he purchased, Tucker's purchases comprised fully 100% of their overall volume on the date of his purchase.

**The Illegal Profits**

67.    On April 30, 2007, Eurex publicly announced its $67.50-per-share cash offer for ISE, and by the market close, ISE's stock price had increased 20 points, for an almost 47 percent gain.

68.    The out-of-the-money ISE call options purchased by Genzale and Tucker increased in an exponential fashion, increasing to trading prices between 22 and 81 times the prices at which they bought them.

69.    In total, Tucker and Genzale's ISE trading resulted in illegal trading profits exceeding $1.8 million, while the other Marshall-Tucker partner's ISE trading resulted in illegal profits of approximately $31,000.

**CLAIM**
Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5
[17 C.F.R. § 240.10b-5] promulgated thereunder

70.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 69 above.

71.    John F. Marshall misappropriated material nonpublic information about Eurex's planned cash offer for ISE and used that information to tip defendants Alan L. Tucker and Thomas Genzale in breach of his fiduciary duties to ISE and its shareholders.

72.    Defendants Alan L. Tucker and Thomas Genzale knew or should have known that the information they received from Marshall was material nonpublic information provided in breach of Marshall's fiduciary duties to ISE.

73.    As a result, between at least November 20, 2006 and April 30, 2007, each defendant, directly or indirectly, in connection with trades in ISE common stock and options, by use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (1) employed devices, schemes, or

13

artifices to defraud; (2) made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; or (3) engaged in acts, practices or transactions which operated as a fraud or deceit upon purchasers or sellers of securities or upon other persons, in connection with the purchase or sale of securities.

74.     As part of the violative conduct, each defendant, while in possession of material nonpublic information about Eurex's plans to make a cash offer for ISE, and under circumstances in which they knew or should have known that the information was confidential and had been obtained through misappropriation, a breach of fiduciary duty or other relationship of trust and confidence, or other wrongful acts, purchased or caused the purchase of ISE securities.  Each defendant, while under a legal duty to either disclose or abstain from trading, did not disclose the material nonpublic information they possessed to the sellers of the ISE securities that they bought.

75.     By reason of the foregoing acts, practices, and transactions, each defendant violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

## I.

Grant a Final Judgment of Permanent Injunction restraining and enjoining each defendant and their agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] promulgated thereunder.

## II.

Order Tucker and Genzale to disgorge illegal trading profits plus prejudgment interest thereon, and order Marshall to disgorge the illegal trading profits of the other

Marshall-Tucker partner, and to jointly and severally disgorge the illegal trading profits of Tucker and Genzale (plus prejudgment interest thereon).

### III.

Order the defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### IV.

Order that Marshall be permanently barred from serving as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)]; and

### V.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated:  August 21, 2009

Respectfully submitted:

By:  *Carl A Tibbetts  /S/*
Carl A. Tibbetts, Trial Counsel (CT 3248)
Cheryl J. Scarboro
C. Joshua Felker
J. Lee Buck, II
Ricky Sachar,

Attorneys for Plaintiff
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-4030
Phone: (202) 551-4483
Facsimile: (202) 772-9245, 9233
Tibbettsc@sec.gov